# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

FAREEDULLAH NAWABI,

    Petitioner,

    v.

DONALD J. TRUMP,
*President of the United States,*
VERNON LIGGINS,
*Acting Director, Baltimore Field Office,*
*United States Immigration and Customs*
*Enforcement,*
TODD LYONS,
*Acting Director, United States Immigration*
*and Customs Enforcement,*
MARKWAYNE MULLIN,
*Secretary of Homeland Security,* and
TODD BLANCHE,
*Acting Attorney General of the United States,*
*in their official capacities,*

    Respondents.

Civil Action No. 25-3831-TDC

## MEMORANDUM OPINION

Petitioner Fareedullah Nawabi, who is currently in immigration detention and subject to a final order of removal, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. Nawabi seeks release from custody and an order staying his removal primarily on the grounds that he is presently challenging in state post-conviction proceedings the state criminal conviction underlying his final order of removal, and that detention and removal prior to the resolution of those proceedings would violate his right to due process of law under the Fifth Amendment to the United States Constitution and would also violate the Tenth Amendment to the Constitution and federalism principles. With their Answer to the Petition, Respondents have filed

a Motion to Dismiss. Because the proper response to a Petition for a Writ of Habeas Corpus is the filing of an Answer, a Motion to Dismiss is permitted only if the Federal Rules of Civil Procedure are applied to this case, and this Court declines to do so in part because all available arguments can be advanced through the Answer, the Court will strike the Motion and consider only the Answer. *See* Rules 1(b), 5, 12, Rules Governing Section 2254 Cases in the United States District Courts. The Court held hearings on the Petition on February 13, 2026 and March 3, 2026. For the reasons set forth below, the Petition will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Nawabi is a citizen of Afghanistan who lawfully entered the United States as a refugee in 1989 when he was approximately 19 years old. With the assistance of the United States Department of State, Nawabi and his family settled in New York City.

### I.    Pre-2025 Events

On June 14, 1995, Nawabi pleaded guilty in a New York state court to one count of first-degree criminal sale of a firearm, seven counts of third-degree criminal sale of a firearm, and one count of second-degree criminal sale of a controlled substance. On August 8, 1995, Nawabi was sentenced to a total term of 17 years to life imprisonment. On July 23, 1996, an immigration judge issued to Nawabi a final order of removal to Afghanistan pursuant to section 237 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227, which as relevant here provides that a noncitizen convicted of violating "any law" relating to a controlled substance or the purchase or sale of a firearm "is deportable." 8 U.S.C. § 1227(a)(2)(B)(i), (C). In 1999, Nawabi's state conviction was affirmed on direct appeal.

On September 13, 2012, Nawabi was released from prison and arrested by United States Immigration and Customs Enforcement ("ICE") agents the same day. However, at that time,

Afghanistan refused to accept Nawabi for repatriation or to issue travel documents for him because it did not have a record of him. On December 21, 2012, Nawabi was released from immigration custody under an Order of Supervision and received employment authorization. From 2012 to 2025, Nawabi complied with the conditions of the Order of Supervision. During that time, he moved to Maryland and purchased a home there. He is now married and has seven children under the age of eleven, all of whom are United States citizens.

## II.    Motion to Vacate the Conviction

On July 9, 2025, Nawabi filed a Motion to Vacate his state criminal conviction pursuant to section 440.10 of the New York Criminal Procedure Law ("the 440.10 Motion"), which provides that "[a]t any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment" upon specified grounds, including that the "judgment was obtained in violation of a right of the defendant under the constitution of [New York] or of the United States." N.Y. Crim. Proc. Law § 440.10(1)(h) (McKinney 2023). In the 440.10 Motion, Nawabi asserted that his conviction was obtained in violation of his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution because his attorney had failed to obtain a translator even though Nawabi lacked proficiency in English, failed to explain the length of the sentence to which his guilty plea exposed him, failed to advise him of the immigration consequences of his guilty plea, took positions contrary to Nawabi's interests when Nawabi filed a self-represented motion to withdraw his guilty plea, and was otherwise deficient in his performance. Nawabi's 440.10 Motion remains pending before the New York court that entered his judgment of conviction.

### III.    Procedural History

On November 21, 2025, Nawabi was arrested by ICE agents in or near Baltimore, Maryland. He was taken to ICE's Baltimore Field Office and given an informal interview the same day. On November 22, 2025, Nawabi filed the present Petition. Since November 23, 2025, in order to preserve the Court's jurisdiction and to ensure that Nawabi had meaningful access to counsel for purposes of the adjudication of the Petition, the Court suspended the removal of Nawabi from the United States and the detention of Nawabi outside of Maryland or a neighboring state, but it did not enjoin Respondents from taking required actions to prepare for removal. On November 24, 2025, the Acting Field Office Director of the ICE Baltimore Field Office issued to Nawabi a Notice of Revocation of Release stating that "ICE has determined that you can be expeditiously removed from the United States pursuant to the outstanding order of removal against you" and that "[y]our case is currently under review by the Government of Afghanistan for issuance of a travel document." Notice of Revocation of Release at 1, Ans. Ex. 3, ECF No. 9-4. On December 10, 2025, ICE contacted the Consulate of Afghanistan in Ottawa, Canada to request a travel document for Nawabi, which would permit Respondents to remove Nawabi to Afghanistan. The consulate issued a travel document for Nawabi in response to that request, but because it was determined that such a request needed to be submitted to the Afghan consulate in Doha, Qatar, ICE submitted a new request for a travel document for Nawabi to the Afghan consulate in Qatar on February 27, 2026.

The Court held two hearings on the Petition, on February 13, 2026 and March 3, 2026. During the March 3, 2026 evidentiary hearing, the Court received the testimony of Melanie White, the Acting Deputy Field Office Director for the ICE Baltimore Field Office, and Mustafa Lawrence, the ICE Deportation Officer who conducted the informal interview of Nawabi. After

that hearing, the Court directed Respondents to file with the Court the travel document for Nawabi within one day of receiving it from the Afghan consulate in Qatar. To date, Respondents have not filed such a document.

Nawabi is presently detained at the Federal Correctional Institution in Lewisburg, Pennsylvania, where, according to Respondents, ICE detainees are kept physically separate from federal inmates serving criminal sentences and are supervised by different staff.

## DISCUSSION

A federal court will issue a writ of habeas corpus when the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). In the Petition, Nawabi asserts several claims in the following numbered counts: (1) a claim of unlawful post-removal order detention in violation of the INA and the right to due process of law under the Fifth Amendment, as interpreted by *Zadvydas v. Davis*, 533 U.S. 678 (2001), on the basis that his removal is not reasonably foreseeable; (2) a claim that in re-detaining Nawabi, Respondents failed to follow the required procedures set forth in 8 C.F.R. §§ 241.4 and 241.13, in violation of the right to due process of law under the Fifth Amendment, as interpreted by *United States ex rel. Accardi v. Shaughnessy* ("*Accardi*"), 347 U.S. 260 (1954), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; (3) a claim of a violation of the right to due process of law under the Fifth Amendment in that Nawabi's detention and removal are predicated on a state criminal conviction that is presently under collateral review for alleged constitutional violations; and (4) a claim that his removal would violate the Tenth Amendment and structural federalism principles because it would constitute federal interference with ongoing state post-conviction proceedings. Nawabi seeks a declaratory judgment that his present detention is unlawful under the INA, APA, and Fifth Amendment, a declaratory judgment that his detention and removal prior

to the resolution of his 440.10 Motion contravenes the Tenth Amendment and federalism principles, and an order that he be released from Respondents' custody.

## I.    *Accardi* Claim

The Court first addresses the argument in Count 2 that Respondents violated Nawabi's due process rights by failing to follow their own regulations when they detained him in 2025 and thus effectively revoked his release conditions, in violation of the *Accardi* doctrine and the APA. Under the *Accardi* doctrine, "an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination" as a violation of the individual's constitutional right to due process. *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999). Nawabi similarly argues that under the APA, an agency's failure to follow its own regulations is unlawful. *See* 5 U.S.C. § 706(2)(D). Specifically, Nawabi argues that Respondents violated his due process rights by failing to conduct an "individualized post-order custody review[]" as required by 8 C.F.R. §§ 241.4 and 241.13. Pet. ¶ 56, ECF No. 1.

To address this claim, the Court first identifies the legal framework governing Nawabi's detention, his release on conditions in 2012, and his recent re-detention in 2025. Because Nawabi was issued a final order of removal in 1996, he was initially subject to detention pursuant to 8 U.S.C. § 1231(a), which generally provides that when noncitizens are issued an order of removal, they are subject to mandatory detention and required to be removed within 90 days, a time frame known as "the removal period." *See* 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."); *id.* § 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien."). If an individual is not deported within the removal

period, that person, "pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3). Certain "[i]nadmissible or criminal aliens," including those such as Nawabi who were found to be deportable under 8 U.S.C. § 1227(a)(2) based on criminal convictions for drug and firearm offenses, may be detained beyond the removal period, but if they are released, they "shall be subject to the terms of supervision" applicable under 8 U.S.C. § 1231(a)(3). *Id.* § 1231(a)(6). Such release is generally governed by the regulations set forth in 8 C.F.R. § 241.4. A noncitizen who is ultimately released pursuant to these provisions "must abide" by "conditions or special conditions on release" imposed by ICE. 8 C.F.R. § 241.4(j)(1).

The regulations also provide "special review procedures" for "aliens who are subject to a final order of removal and are detained under the custody review procedures provided at [8 C.F.R.] § 241.4 after the expiration of the removal period, where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." *Id.* § 241.13(a). This regulation applies when ICE has made "a determination under this section that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* § 241.13(b)(1). Once that determination has been made, the noncitizen is released subject to certain conditions of release. *See id.* § 241.13(h).

In this instance, after ICE detained Nawabi follow his release from his New York state sentence in September 2012, Afghanistan would not accept Nawabi, so he was released pursuant to an Order of Supervision approximately 90 days later, in December 2012. Thus, his release was consistent with the legal authority set forth above and was governed by both 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13.

7

These regulations also govern the revocation of those release conditions and the resulting re-detention of a noncitizen, and they provide three means by which such revocation and re-detention may occur. First, a noncitizen "who has been released under an order of supervision or other conditions of release" who then "violates the conditions of release may be returned to custody." *Id.* § 241.4(*l*)(1). Under this provision, "[u]pon revocation, the alien will be notified of the reasons for revocation of his or her release," after which "[t]he alien will be afforded an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." *Id.* Here, there has been no claim that Nawabi violated any conditions of release.

Second, the regulations provide that even absent a violation of conditions of release, in limited instances, an ICE Field Office Director may "revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner." *Id.* § 241.4(*l*)(2); *see Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 160 (W.D.N.Y. 2025) (noting that the reference in 8 C.F.R. § 241.4(*l*)(2) to the "Executive Associate Commissioner" now refers to the "Executive Associate Director of ICE"); 8 C.F.R. § 1.2 (stating that "district director" can refer to an ICE Field Office Director or an Acting ICE Field Office Director). Specifically:

> Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (i)    The purposes of release have been served;
>
> (ii)    The alien violates any condition of release;
>
> (iii)    It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
>
> (iv)    The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(2).  Upon revocation under this provision, a noncitizen must receive a prompt informal interview to provide "an opportunity to respond to the reasons for revocation stated in the notification," and if there is no release following that interview, there must be a custody review "to occur within approximately three months after release is revoked." *Id.* § 241.4(*l*)(1), (3).

Third, when a noncitizen who was subject to a final order of removal was released pursuant to 8 C.F.R. § 241.13 because removal was not reasonably foreseeable, ICE may revoke that release upon a violation of conditions of release or if "changed circumstances" have led to a determination "that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(1), (2).  To revoke such release, ICE must follow specific revocation procedures, including that (1) "[u]pon revocation, the alien will be notified of the reasons for revocation"; (2) ICE "will conduct an initial informal interview promptly after . . . return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification"; and (3) "[t]he alien may submit any evidence or information" to show that there is no "significant likelihood" of removal in the "reasonably foreseeable future," or that the alien "has not violated the order of supervision." *Id.* § 241.13(i)(3).  If the noncitizen is not released following the informal interview, the provisions of 8 C.F.R. § 241.4 govern the continued detention. *See id.* § 241.13(i)(2).

Here, the record demonstrates that Respondents generally complied with the regulations governing the second and third means by which Nawabi's conditions of release could be revoked and he could be re-detained.  In relation to the procedures set forth in 8 C.F.R. § 241.4(*l*), on November 24, 2025, the Acting Field Office Director of the ICE Baltimore Field Office issued a notice to Nawabi stating that he had "determined that your detention and revocation of your order of supervision is in the public interest," that "circumstances do not reasonably permit referral of

the case to the Executive Associate Director, Enforcement and Removal Operations," and that ICE had determined that there were "changed circumstances" in Nawabi's case in that ICE had "determined that you can be expeditiously removed from the United States pursuant to the outstanding order of removal." Notice of Revocation of Release at 1. Where the Acting ICE Field Office Director made the requisite finding that the matter could not be referred to the ICE Executive Associate Director, the revocation decision was made by a qualified ICE official, and the Notice reflects that the revocation decision is consistent with 8 C.F.R. § 241.4(*l*)(2) in that it was based on a finding that it was "appropriate to enforce a removal order." 8 C.F.R. § 241.4(*l*)(2)(iii). The record also reflects that Nawabi received a prompt informal interview and has also received a custody review on February 12, 2026, approximately three months after his detention. Notice at 1, ECF No. 35.

As to the revocation procedures set forth in 8 C.F.R. § 241.13(i), the same Notice of Revocation of Release issued on November 24, 2025 informed Nawabi that there were "changed circumstances" that led to a determination that Nawabi now may be removed expeditiously, the record shows that Nawabi was provided with an informal interview upon his re-detention, and the Notice informed Nawabi that he "may submit any evidence or information" to be considered in support of his release. Notice of Revocation of Release at 1. As discussed above, the requirements of 8 C.F.R. § 241.4, which apply once Nawabi was not released following the informal interview, have been generally satisfied.

Thus, because Nawabi received the requisite notice, informal interview, and custody review process to which he was entitled under 8 C.F.R. §§ 241.4(*l*)(3) and 241.13(i), he has not demonstrated that Respondents failed to follow the regulations governing revocation of his conditions of release and his re-detention, such that he has not established a violation of the

*Accardi* doctrine or the APA. The Petition will therefore not be granted on this basis. In the future, if relevant, Nawabi may renew any *Accardi* or APA claim in relation to his most recent custody review, which Respondents have stated occurred on May 1, 2026 but is presently subject to a lengthy delay in processing by ICE headquarters.

## II.    Due Process: Use of the State Conviction

In Count 3, Nawabi asserts a violation of the Due Process Clause of the Fifth Amendment in that his detention and impending removal are "based on a conviction whose validity is under serious and ongoing constitutional challenge" in state post-conviction proceedings. Pet. ¶ 65.

As a preliminary matter, Respondents argue that to the extent that Nawabi "seeks an order staying ICE's effectuation of [his] removal order or order[ing] his immediate release because of pending post-conviction proceedings in New York," the Court lacks jurisdiction to provide such relief pursuant to 8 U.S.C. § 1252(g). Ans. at 15, ECF No. 9-1. That provision provides in relevant part:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g); *see Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 696 (4th Cir. 2019) (acknowledging that this authority of the Attorney General is presently held by the Secretary of Homeland Security); *see also Mestanek v. Jaddou*, 93 F.4th 164, 170 (4th Cir. 2024) (noting that the Homeland Security Act of 2002 largely transferred the Attorney General's authority over federal immigration laws to the Secretary of Homeland Security).

This provision has been construed narrowly. In *Reno v. American-Arab Anti-Discrimination Committee* ("*AADC*"), 525 U.S. 471 (1999), the United States Supreme Court held

11

that 8 U.S.C. § 1252(g) bars judicial review of challenges to only "the three discrete actions" listed in the statute:  the decisions to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders," and that the provision is "directed against a particular evil:  attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 482, 485–86 n.9.  Thus, it bars only challenges to "the [Secretary's] decision to exercise her discretion to initiate or prosecute these specific stages in the deportation." *Bowrin v. U.S. Immigr. & Naturalization Serv.*, 194 F.3d 483, 488 (4th Cir. 1999).  In *Bowrin*, the petitioner had conceded deportability based on prior convictions and sought relief from deportation under section 212(c) of the INA, 8 U.S.C. § 1182(c), but such relief was denied based on the Attorney General's determination that, as a matter of law, recent amendments to section 212(c) applied retroactively to preclude relief. *Bowrin*, 194 F.3d at 486.  Even though the petitioner would be removed from the country in the absence of relief, the United States Court of Appeals for the Fourth Circuit held that § 1252(g) did not bar district court jurisdiction over a habeas petition challenging this legal interpretation, which did not challenge a discretionary determination to remove him. *Id.* at 488.  Accordingly, § 1252(g) "does not apply to agency interpretations of statutes," as such "decisions do not fall into any of the three categories enumerated in § 1252(g)," including the execution of a removal order. *Id.*  By contrast, the Fourth Circuit held that § 1252(g) properly barred judicial review of the habeas petition in *Mapoy v. Carroll*, 185 F.3d 224 (4th Cir. 1999), in which the petitioner had already pursued review unsuccessfully with the Board of Immigration Appeals ("BIA") and the Fourth Circuit, and the district court was presented with claims that extended beyond pure questions of law, including arguments that the equities favored a stay of deportation and that the petitioner should be released from custody because he was not a flight risk. *Id.* at 226–28, 230.

Based on these principles, the Court finds that it may review the due process claim in Count 3 as it relates to Nawabi's detention, because detention is not one of "the three discrete actions" enumerated in 8 U.S.C. § 1252(g). *AADC*, 525 U.S. at 482; *Zadvydas*, 533 U.S. at 688 (noting that when a petitioner challenges "the extent of the Attorney General's authority under the post-removal-period detention statute," § 2241 habeas proceedings are available for "statutory and constitutional challenges" to such detention). As for the argument that the alleged due process violation in Count 3 bars removal, the Court agrees that a direct challenge to the discretionary decision to execute the removal order against Nawabi would be barred by 8 U.S.C. § 1252(g). For such a challenge, the "sole and exclusive means for judicial review of an order of removal" is "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5).

However, in the Reply, Nawabi clarifies that in this claim, he is arguing that as a matter of law, his state criminal convictions cannot be deemed to meet the INA's definition of a conviction because they are presently under collateral attack in New York post-conviction proceedings. Section 1252(g) does not apply to "interpretations of statutes" as such "decisions do not fall into any of the three categories" set forth in that provision. *See Bowrin*, 194 F.3d at 485–86, 488, 490 (holding that the question of whether a provision of the Anti-Terrorism and Effective Death Penalty Act applied retroactively to bar the petitioner's eligibility for relief from deportation under section 212(c) of the INA was a pure question of statutory interpretation reviewable by the district court); *Tasios v. Reno*, 204 F.3d 544, 547 (4th Cir. 2000) (stating that *Bowrin* holds that district courts have jurisdiction pursuant to 28 U.S.C. § 2241 to review questions of law such as an agency interpretation of the INA). When the claim is construed in this way, the Court finds that whether due process precludes treating convictions presently subject to post-conviction challenges as convictions under the INA is a pure question of law which the Court may review, even though the

13

resolution of this issue may affect whether Nawabi's removal order may be executed. *See Bowrin*, 194 F.3d at 488.

As to the merits of this claim, although the Petition frames this argument as based on due process, in the Reply Nawabi relatedly argues that a conviction that is "non-final, vacated, or subject to collateral attack" might not qualify as a conviction for purposes of the INA. Reply at 3, ECF No. 14. The INA, however, defines a "conviction" as a "formal judgment of guilt of the alien entered by a court." 8 U.S.C. § 1101(a)(48)(A). Where it is undisputed that Nawabi received a formal judgment of guilt from a New York court in 1995, his conviction generally falls within the plain language of the statute. Moreover, his convictions were upheld on direct appeal, and Nawabi has acknowledged in the Petition that the "finality of the conviction is not in dispute." Pet. ¶ 67. Notably, although the BIA treats some vacated convictions as if they had never occurred, *see Dung Phan v. Holder*, 667 F.3d 448, 452 (4th Cir. 2012), at this point, Nawabi's convictions have not been vacated. Finally, as to whether Nawabi's pending 440.10 Motion places his convictions outside of the statutory definition, the Fourth Circuit has stated that an "'immigration judge and the [BIA] cannot go behind the criminal judgment and consider an alien's collateral attack on his conviction'—and neither can [the court]." *Winston v. Holder*, 439 F. App'x 249, 250 (4th Cir. 2011) (quoting *Ugwu v. Gonzales*, 242 F. App'x 917, 918 (4th Cir. 2007)) (rejecting an argument that a prior conviction should not provide a basis for a finding that a noncitizen had been convicted of a "crime of domestic violence" because there was allegedly ineffective assistance of counsel associated with the guilty plea). Accordingly, the Court finds no persuasive basis to conclude that under the INA, Nawabi's state criminal conviction does not qualify as a conviction underlying his order of removal based on the fact that Nawabi has ongoing post-conviction proceedings in which he is advancing a potentially meritorious collateral attack on the conviction.

Nawabi also advances the more fundamental due process argument that, even if his state criminal conviction meets the INA's definition of a conviction, where the conviction is "so structurally suspect" in light of his ineffective assistance of counsel argument, and the 440.10 Motion has created "an open, live controversy" on whether the conviction is valid, due process requires that it not be considered to provide the "immediate basis" for detention or removal. Pet. ¶¶ 64–67. Where, as discussed above, a removal based on the present conviction comports with the definitions and requirements of the INA, such that there was fair notice that removal could occur under these circumstances, the Court finds no violation of due process. Indeed, where the grounds for deportation are set by Congress and include multiple grounds for removal unrelated to whether the noncitizen has a criminal conviction, the Court does not conclude that due process requires that an individual may not be removed consistent with the terms of the INA without first having been permitted to complete all post-conviction proceedings, including proceedings initiated nearly 30 years after the original conviction. Notably, Nawabi does not cite, and the Court has not found, any legal authority requiring as a matter of due process, or even permitting, a federal district court to delay or enjoin a deportation on the ground that an ongoing post-conviction challenge in state court is likely to result in, but has not yet resulted in, the vacating of the conviction underlying the order of removal. Such action to delay the execution of an order of removal is generally the purview of the immigration courts, and, upon a petition for review, the United States Courts of Appeals. *See, e.g.*, *Garcia Cabrera v. Garland*, 21 F.4th 878, 885 (4th Cir. 2022) (reversing an immigration judge's denial of a motion to continue removal proceedings due to pending collateral relief and stating that immigration courts must consider the likelihood that collateral relief will be granted and then materially affect the outcome of the removal proceedings). As for detention, where Nawabi has a final criminal conviction that renders him subject to mandatory detention

pending removal, *see* 8 U.S.C. § 1231(a)(2)(A), the Court does not find that due process requires that the Court nevertheless release him pending removal because he has filed a collateral attack on that conviction. The Court will therefore deny the Petition as to this due process argument.

### III.    Tenth Amendment

As his primary argument, in Count 4, Nawabi asserts that his detention and impending removal before his 440.10 Motion is resolved violates the Tenth Amendment and structural federalism principles because "New York has a sovereign interest" in its post-conviction procedures, and Nawabi's detention and removal "effectively strip[] a State of its ability to adjudicate and remedy constitutional errors in its criminal cases" by impairing "the practical ability of the New York courts to hold evidentiary hearings, take [Nawabi's] testimony, and implement meaningful relief." Pet. ¶¶ 71, 78, 80. In his Reply, Nawabi argues that the federal government owes deference to state criminal legal systems as a matter of comity, and that the federal government's use of a state conviction under post-conviction review violates the anti-commandeering doctrine, under which the federal government is prohibited from requiring states or state officers to administer federal programs, including by effectively "lending" an "unfinished, and potentially unlawful, state criminal process" to advance federal ends. Reply at 14.

Respondents again argue that 8 U.S.C. § 1252(g) bars judicial review of the Tenth Amendment claim. For the same reasons stated in relation to Count 3, the Court finds that it may review this claim because it does not challenge a discretionary decision to execute Nawabi's order of removal and instead presents a question of law to be reviewed: whether the Tenth Amendment and federalism principles bar the Government from executing an order of removal based on a criminal conviction that is presently the subject of state post-conviction proceedings until after the resolution of that state court challenge. *See supra* part II.

16

As in any case challenging the "scope of the Federal Government's authority with respect to the States," the Court must determine whether the challenged action "oversteps the boundary between federal and state authority." *New York v. United States*, 505 U.S. 144, 159 (1992). The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Pursuant to the Tenth Amendment, every enumerated federal power "is subject to limits that may, in a given instance, reserve power to the States." *New York*, 505 U.S. at 157. Thus, for example, Congress may not conscript State officers to administer, or compel States to enforce, federal programs. *Printz v. United States*, 521 U.S. 898, 935 (1997). However, when otherwise legitimate state and federal laws conflict, the Supremacy Clause provides that federal law preempts state law. U.S. Const. art. VI, cl. 2.

Here, Nawabi focuses on the "historical limits on federal power" at the time of the enactment of the Constitution and argues that during that era, "[c]riminal law enforcement and general police power" were "at the heart of state sovereignty." Reply at 4–5. Analogizing to the recently adopted standard applicable to claims under the Second Amendment as set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022), Nawabi argues that in the absence of "Founding-era analogues" for an asserted exercise of federal authority, "the power remains reserved to the states under the Tenth Amendment." Reply at 5. Based on this principle, Nawabi argues that there is no "historical analogue" for the federal practice at issue here, the removal of an individual from the United States before the completion of state post-conviction proceedings. *See Bruen*, 142 S. Ct. at 2133.

Nawabi's reasoning fails for multiple reasons. First, there is no authority supporting the view that the Second Amendment history-and-tradition framework is applicable to a claim based

17

on the Tenth Amendment. The Court finds no reason to adopt such a rule here. Second, even accepting that criminal law enforcement and the general police power are traditionally State functions, *see Bond v. United States*, 572 U.S. 844, 858–60 (2014), Nawabi has cited no example of a Founding-era practice of requiring federal authority over immigration matters to give way to state police powers, which is not surprising because the federal government's immigration authorities specifically derive from its enumerated constitutional powers.

Specifically, the federal action at issue here, deportation or removal of a noncitizen pursuant to the INA, is an exercise in the regulation of the status of noncitizens at and within our borders, which is a traditional function of the federal government. *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (stating that the Supreme Court has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders"). Such federal authority derives from the provisions in Article I of the Constitution that grant to Congress the powers to "regulate Commerce with foreign Nations" and to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, and also the federal government's "broad authority over foreign affairs." *Toll*, 458 U.S. at 10; *see* U.S. Const. art. II, § 2 (stating that the President, with the advice and consent of the Senate, may make treaties and appoint ambassadors). Accordingly, the Supreme Court has held that Congress has plenary power over immigration, subject to constitutional limitations. *See, e.g., Zadvydas*, 533 U.S. at 695; *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 940–41 (1983). Under these principles, the Supreme Court has found that the federal authority over immigration matters can require constraints on states' authorities to enact criminal laws. For example, the Supreme Court has held that states may not enact certain criminal laws relating to the registration or employment of noncitizens because such laws encroach into fields of law occupied by the federal government or conflict with the federal immigration enforcement

system. *Arizona v. United States*, 567 U.S. 387, 400–07 (2012). In finding to be preempted a state law authorizing state officers to decide when a removable noncitizen should be detained, the Supreme Court stated that "the removal process is entrusted to the discretion of the Federal Government" because a "decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States," and such decisions "touch on foreign relations" and "must be made with one voice." *Id.* at 409–10.

Applying these principles to this matter of first impression, the Court concludes that the Tenth Amendment and principles of federalism do not prevent the federal government from seeking to remove a noncitizen such as Nawabi who has a final conviction for certain state offenses but who is presently seeking the vacating of those convictions in state post-conviction proceedings. While Nawabi cites cases generally relating to the balance of power between the federal government and the states and between federal and state courts, *see, e.g., Younger v. Harris*, 401 U.S. 37, 54 (1971) (holding that federal courts ordinarily may not enjoin ongoing state criminal prosecutions absent unusual circumstances), he has identified no example of an instance in which an exercise of the federal power over immigration was required to give way to an exercise of a state's police power based on the Tenth Amendment or principles of federalism.

Rather, in one of the few cases applying the Tenth Amendment in balancing federal authority over immigration and state authority over criminal law enforcement, the United States Court of Appeals for the First Circuit rejected an argument that the Tenth Amendment precludes the federal government from treating a Puerto Rico court's finding of guilt and suspension of further proceedings as a conviction under the INA. *See Herrera-Inirio v. Immigr. & Naturalization Serv.*, 208 F.3d 299, 307 (1st Cir. 2000). Thus, the determination of whether a particular disposition of a state criminal case should be treated as a conviction under the INA is a purely

19

federal matter, which in no way prevents the state from treating such a disposition in whatever way it chooses in matters under state authority. *See id.*; *see Molina v. Immigr. & Naturalization Serv.*, 981 F.2d 14, 19 (1st Cir. 1992) (stating that the federal government, based on "the need for national uniformity in the application of federal law," was permitted to deem a Rhode Island "plea plus probation" disposition of a criminal case to be a conviction for immigration purposes even when Rhode Island law states that it is not a "conviction"). In light of the federal plenary power over immigration, which generally need not give way to state criminal law matters, the Court does not find that as a matter of federalism, a federal immigration enforcement action must be suspended to allow a state court to conduct state post-conviction proceedings. Indeed, particularly where New York places no time limit on the initiation of such proceedings, Nawabi's 440.10 Motion was filed nearly 30 years after his conviction, and the 440.10 Motion has been pending for over 10 months with no sign of an imminent resolution, a contrary rule would likely intrude on the federal authority over immigration matters.

Nawabi's argument that the federal government has "conscript[ed] unfinished state criminal judgments as federal enforcement tools," and has thus commandeered New York's criminal legal system in contravention of *Printz*, *see* Reply at 11, does not alter the Court's conclusion. Here, the federal government has neither compelled New York to enforce federal immigration law nor conscripted state officers into enforcing it. *See Printz*, 521 U.S. at 935. Rather, the federal government's planned enforcement of the order of removal can proceed without any action by the state court or by state law enforcement officials.

Finally, Nawabi argues that his removal would invade state sovereignty by making it more difficult for the New York court to proceed with its consideration of his 440.10 Motion. He has cited no authority for the proposition that a federal action that causes a hindrance to a state court

proceeding relating to a criminal case would amount to an unconstitutional invasion of state sovereignty. Moreover, there is no basis in the record to conclude that the New York court could not consider the 440.10 Motion, which presumably is based in large part on the existing state court record, after any removal of Nawabi, or that it could not secure any necessary testimony by Nawabi while he is physically outside of the United States.

For all of these reasons, the Court will not grant the Petition on the grounds that a removal prior to a ruling on the 440.10 Motion would violate the Tenth Amendment or federalism principles.

## IV.    *Zadvydas* Claim

Nawabi also alleges that Respondents are holding him in custody in violation of 8 U.S.C. § 1231(a)(6) because the original removal period of 90 days has expired, and it is not reasonably foreseeable that he will be deported. In *Zadvydas*, the Supreme Court considered whether 8 U.S.C. § 1231(a)(6) authorizes detention of a noncitizen subject to a removal order "*indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal." *Zadvydas*, 533 U.S. at 682. In that case, the petitioners had received removal orders but were detained past their respective removal periods in part because their native countries and other countries with which they had some familial ties had refused to accept them. *See id.* at 684–86. Recognizing the "serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty," *id.* at 692, the Supreme Court held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. The Court thus directed federal habeas courts to determine "whether the detention in question exceeds a period reasonably necessary to secure removal" and to "measure reasonableness primarily in terms of the statute's basic purpose,

namely, assuring the alien's presence at the moment of removal." *Id.* If removal is not "reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699–700.

The Court acknowledged, however, that "review must take appropriate account of the greater immigration-related expertise of the Executive Branch" and that doing so "will often call for difficult judgments." *Id.* at 700. To limit "the occasions when courts will need to make" such judgments, the Court recognized a "presumptively reasonable period of detention." *Id.* After noting that Congress likely did not conclude that the 90-day removal period it established in 8 U.S.C. § 1231(a)(1) was sufficient to accomplish "all reasonably foreseeable removals," the Court established that the "presumptively reasonable period of detention" is six months, and stated that, after that period, once a noncitizen "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

Nawabi was issued a final order of removal in 1996, and in fact was detained by ICE for over 90 days following his release from imprisonment in 2012, so the 90-day removal period has elapsed. The parties agree that Nawabi is presently detained pursuant to 8 U.S.C. § 1231(a), which provides that certain noncitizens, including those who are removable based on certain criminal convictions referenced in 8 U.S.C. § 1227(a)(2), may be detained beyond the 90-day removal period. *See* 8 U.S.C. § 1231(a)(6). Where Nawabi does not dispute, for purposes of this issue, that his state convictions render him removable under 8 U.S.C. § 1227(a)(2), his detention beyond the initial 90 days is authorized.

However, relying on *Zadvydas*, Nawabi argues that his removal is not reasonably foreseeable, and his present detention is thus unlawful, because Respondents previously concluded

in 2012 that his removal to Afghanistan was not reasonably foreseeable, had not made new arrangements for his removal as of the filing of the Petition, and have not made an individualized determination that his detention is justified, whether because he is dangerous or a flight risk. In response, Respondents initially argued that Nawabi had not established that he had been held in post-removal order detention for longer than the presumptively reasonable six-month period, and that regardless of the length of his present detention, Respondents have demonstrated that his removal is reasonably foreseeable.

With the time that has passed since the filing of the Petition, it is now undisputed that the presumptively reasonable six-month period has elapsed. Nawabi was detained by ICE from September 13, 2012 until his release on December 21, 2012, a period of over 90 days. Some courts have concluded that the six-month period runs continuously from the beginning of the removal period, even if the noncitizen is not detained throughout that period. *See, e.g., Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 500 (S.D.N.Y. 2009). The Court need not decide that issue because regardless of whether Nawabi's first 90 days of detention in 2012 and the time period immediately following it are counted, Nawabi's more recent period of detention, which began on November 21, 2025, by itself totals more than six months. At the Case Management Conference on May 18, 2026, Respondents acknowledged that the six-month presumptively reasonable period would expire on May 21, 2026. Thus, at present, Nawabi must provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Castaneda v. Perry*, 95 F.4th 750, 756 (4th Cir. 2024) (quoting *Zadvydas*, 533 U.S. at 701). If he does so, the burden shifts to Respondents to rebut that showing. *Id.; see Clark v. Martinez*, 543 U.S. 371, 386–87 (2005) (holding that the habeas petitions of two inadmissible Cuban petitioners should have been granted because they "were detained well beyond six months after their removal orders became

23

final," and the Government "brought forward nothing to indicate that a substantial likelihood of removal subsists despite the passage of six months").

Here, Nawabi has presented a long history of Respondents' inability to effectuate his removal to Afghanistan. As discussed above, after the 90-day removal period expired in 2012, Nawabi was released on conditions of supervision because Afghanistan would not accept him because it had no record of him, whether as an Afghan national or otherwise. At the March 3, 2026 hearing, Acting Deputy Field Office Director for the ICE Baltimore Field Office Melanie White stated that, in 2012, Afghanistan "did not recognize" Nawabi in that it "did not respond" to the request for a travel document for him. 3/3/26 Hrg. Tr. at 20, ECF No. 36. Since that time, Respondents have had approximately 14 years to secure authorization for his removal to Afghanistan, with no results. Based on that track record, the Court finds that Nawabi has met his initial burden to show a lack of a significant likelihood of removal.

Respondents have presented certain evidence that arguably could rebut this showing. First, with their Answer to the Petition, Respondents submitted a declaration from Jose Guerrero, an Assistant Field Office Director for the ICE Baltimore Field Office, stating that "Afghanistan is routinely accepting its own citizens and nationals upon their removal from the United States and issuing travel documents for those citizens and nationals." Guerrero Decl. ¶ 5, Ans. Ex. 5, ECF No. 9-6. Second, in the same declaration, Guerrero stated that "[o]n December 10, 2025, ICE contacted the Afghanistan consulate in Ottawa, Canada for a travel document request." Id. ¶ 6. Then, at the March 3, 2026 hearing, White testified that, in response to that request, the Afghan consulate in Canada had issued a travel document for Nawabi, 3/3/26 Hrg. Ex. 1, which Respondents argue "acknowledged him as a citizen and national of Afghanistan" and conveyed that Afghanistan is "willing to take him back." 3/3/26 Hrg Tr. at 8–9. White, however,

24

acknowledged that ICE later determined that the request to the Afghan consulate in Ottawa did not comply with the proper procedures, that the correct procedure was to request a travel document from the Afghan consulate in Doha, Qatar, and that ICE made that request on February 27, 2026. During the same testimony, White asserted that "[t]here's no impediment to [Nawabi's] removal at this time" and that he would "more than likely just be reissued a new travel document." *Id.* at 9–10.

Although Respondents' evidence, as of that date, may have been sufficient to rebut the general evidence that Nawabi's removal was not reasonably foreseeable, the quality of that evidence has been undermined by the passage of time. While the Court requested at the March 3, 2026 hearing that Respondents immediately submit a copy of any travel document for Nawabi that it received from the Afghan consulate in Qatar, Respondents have made no such submission in the almost three months since the request was made in late February 2026. At the May 18, 2026 Case Management Conference, Respondents acknowledged that they had not received any response to that request and declined the opportunity to submit any additional evidence to explain the prolonged delay or to show that the travel document would be issued either imminently or at all.

Under these circumstances, where the initial effort to remove Nawabi failed because the Afghanistan government did not "recognize" Nawabi, *id.* at 20, over 13 years have elapsed without any ability to remove Nawabi to Afghanistan, Nawabi has spent over nine months in ICE detention pursuant to the final removal order, and over six months of the most recent detention period has passed without Respondents securing a proper travel document by which to remove Nawabi to Afghanistan, the Court does not find that Respondents have rebutted the evidence that removal is not reasonably foreseeable. Even accepting Respondents' representation that Afghanistan is generally accepting Afghan nationals being removed from the United States, they have not shown

how the prior lack of recognition of Nawabi as an Afghan national is no longer a barrier to removal, particularly in light of the failure to secure a proper travel document for over six months. In similar situations, where petitioners demonstrated factual or legal obstacles that prevented their removals to their countries of origin from being effectuated within a reasonable time, and where the Government did not provide satisfactory evidence to rebut that showing, courts have ordered detainees released on the grounds that their removal was not reasonably foreseeable. *See, e.g.*, *Clark*, 543 U.S. at 386–87.

Specifically, courts regularly order petitioners released when, as here, there were significant delays or other problems in obtaining valid travel documents from their countries of origin that caused the presumptively reasonable six-month period of detention to fully or nearly elapse. *See, e.g.*, *Dong v. Charles*, No. 26-CV-85-LJV, 2026 WL 1473790, at *5–6 (W.D.N.Y. May 26, 2026) (concluding that removal was not reasonably foreseeable where the Chinese petitioner had been detained for eight months and the Government's identity verification request had been pending with the Chinese government for at least five months); *D.S. v. Hernandez*, No. 26-CV-01328-JNW, 2026 WL 1408517, at *1, *3 (W.D. Wash. May 20, 2026) (concluding that removal was not reasonably foreseeable where the Laotian petitioner had been detained for an aggregate period of over five months, the Government had previously obtained a valid travel document from Laos that had since expired, and the Government recently requested a new travel document but had "no assurances" on whether and when it would be issued); *Kim v. Chestnut*, No. 26-CV-03725-EJD, 2026 WL 1382864, at *2 (E.D. Cal. May 18, 2026) (concluding that removal was not reasonably foreseeable, even after the petitioner's phone interview with the South Korean consulate three months earlier, where the petitioner had been detained for seven months since the final order of removal, the travel document request had been pending for five months, and the

26

Government "provided no indication as to the timing of when, or if, the Government of South Korea will issue travel documents"); *Belonogov v. FCI Berlin, Warden*, No. 25-CV-388-SE, 2026 WL 1091203, at *4 (D.N.H. Apr. 22, 2026) (concluding that removal was not reasonably foreseeable where Russia had previously rejected the Russian petitioner's application for a passport, he had been detained for nearly eight months, the Government had "worked diligently to obtain [his] travel documents," but there had been no response to a request for a travel document for four months); *Kovalchuk v. Martinez*, No. 26-CV-00978-JLT, 2026 WL 1179736, at *1–2 (E.D. Cal. Apr. 30, 2026) (concluding that removal was not reasonably foreseeable where the Kazakh petitioner was recently refused entry into Kazakhstan, he had been detained for 11 months, and the Government had received no response for more than three months on its renewed request for travel documents from Kazakhstan); *Decyatnik v. Noem*, No. 25-CV-10027-AH, 2025 WL 4292438, at *1 (C.D. Cal. Dec. 27, 2025) (concluding that removal was not reasonably foreseeable where a former Soviet citizen of Ukrainian origin had been re-detained for seven months, the Ukrainian government initially agreed to accept him but then refused to issue a travel document for a scheduled charter flight, and the next such flight would likely not occur for another six months).

Further, Nawabi's situation is readily distinguishable from cases in which courts rejected *Zadvydas* challenges because the detention was pursuant to a specific proceeding with a definite end point and thus did not contravene *Zadvydas*'s prohibition on indefinite detention. *See, e.g.,* *Demore v. Kim*, 538 U.S. 510, 529–31 (2003) (stating that the mandatory detention of noncitizens pending removal hearings under 8 U.S.C. § 1226(c) comports with due process in part because such detention has "a definite termination point" at the completion of the removal proceedings); *Castaneda*, 95 F.4th at 757–58 (finding that a noncitizen "being detained pending the completion

27

of withholding-only proceedings that he voluntarily initiated" has not established that his "removal is not significantly likely to occur in the reasonably foreseeable future" for purposes of *Zadvydas* because the proceedings and associated detention "have a definite ending point"). Here, in contrast, Nawabi's detention is the kind of "not limited, but potentially permanent" detention prohibited under *Zadvydas*. *Castaneda*, 95 F.4th at 757 (quoting *Zadvydas*, 533 U.S. at 691).

Where Nawabi has been detained by ICE for a total of over nine months, Respondents have been unable to obtain a travel document during the most recent six months of detention and have provided no basis to explain the delay or to expect that the travel document will be forthcoming in the near future, and his post-removal period detention is open-ended and lacks a finite end date, the Court finds that the continued detention of Nawabi violates the INA and due process. *See Zadvydas*, 533 U.S. at 689–90. The Court will therefore grant the Petition on this basis. To the extent that Respondents obtain a travel document in the future, they may seek to re-detain Nawabi in order to effectuate his removal.

## CONCLUSION

For the foregoing reasons, Respondents' Motion to Dismiss will be STRICKEN, and the Petition for a Writ of Habeas Corpus will be GRANTED IN PART and DENIED IN PART in that Nawabi will be released from detention pursuant to *Zadvydas* because his removal is not reasonably foreseeable, but the Petition will be otherwise denied. A separate Order shall issue.

Date: June 3, 2026

THEODORE D. CHUANG
United States District Judge

28